**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:16-CR-214** |
| | : | |
| **v.** | : | **(Judge Conner)** |
| | : | |
| **MOHAMMED RIZK,** | : | |
| | : | |
| **Defendant** | : | |

**<u>MEMORANDUM</u>**

The court sentenced defendant Mohammed Rizk to 27 months in prison after a jury found him guilty of wire fraud, theft of government property, and related offenses in connection with Social Security benefits and proceeds from a life insurance policy he obtained on false pretenses ostensibly on behalf of his teenage daughters. He now moves to vacate his sentence pursuant to 28 U.S.C. § 2255, alleging ineffective assistance of trial counsel in violation of the Sixth Amendment to the United States Constitution. We will deny Rizk's motion.

**I.   <u>Factual and Procedural History[1]</u>**

**A.   <u>Rizk's Relationship with His Ex-Wife and Daughters</u>**

Rizk immigrated to the United States from Egypt in his early 20s. (<u>See</u> Doc. 108, 8/23/17 Trial Tr. 34:20-35:5). He met Lori Sue Stambaugh in the late 1980s

---

[1] The following factual narrative derives from testimonial and documentary evidence adduced during the four-day trial and subsequent evidentiary hearing in this matter, together with the parties' briefing. Citations to the transcripts of the trial held from August 21 through August 24, 2017, are abbreviated as "[Date] Trial Tr. ___," and citations to the June 2, 2023 evidentiary hearing on Rizk's pending motion are abbreviated as "6/2/23 Hr'g Tr. ___." Exhibits are cited as "Gov't Ex. __" and "Def. Ex. __."

while living in New York, and they dated for a few years before marrying in 1994. (See id. at 36:7-13).  The couple had two daughters: Kyra and Serena.  (See id. at 36:14-17).  When the girls were young, the family moved from New York to Middletown, Pennsylvania.  (See id. at 36:18-25).  Rizk and Lori divorced in 2004 and agreed to share custody.  (See id. at 37:1-40:15; see also Def. Ex. 100).  In 2012, Rizk moved back into the family home Lori and the girls occupied at 27 Nissley Drive in Middletown.  (See 8/23/17 Trial Tr. 42:19-21; Doc. 107, 8/22/17 Trial Tr. 143:16-19, 160:6-8).  He was unemployed until Lori helped him get a job at Home Depot in 2014.  (See 8/22/17 Trial Tr. 146:8-10, 160:18-23, 171:15-172:1; 8/23/17 Trial Tr. 35:18-36:6).  Rizk's daughters recalled that he spent most of his time in the basement, did not contribute much around the house, and failed to reconcile with their mother.  (See 8/22/17 Trial Tr. 145:17-146:10, 160:9-161:4).

Lori Rizk died unexpectedly on May 14, 2014.  (See id. at142:19-20; 8/23/17 Trial Tr. 43:5-6, 54:8-9).  On the night of their mother's death, Serena and Kyra— who were 14- and 16-years-old, respectively—left the hospital and moved into their maternal grandparents' home at 1009 Clearview Drive in Middletown.  (See 8/22/17 Trial Tr. 122:14-17, 142:21-22, 144:7-10, 146:11-21, 157:9-159:15, 161:12-162:9).  Rizk was fully aware of the arrangement; in fact, he helped move their belongings.  (See id. at 144:21-25, 162:6-24).  The girls' grandfather, Mark Stambaugh, had their permanent address formally changed for schooling purposes soon after Lori died, and both eventually listed Clearview Drive as the address on their driver's licenses. (See id. at 146:22-147:6, 176:2-177:3).  They never spent another night under their father's roof.  (See id. at 145:1-11, 147:7-10, 159:20-23, 161:5-11, 177:4-6).

The Stambaughs asked Rizk to sign documents relinquishing guardianship of the girls, but he refused and started demanding that they move back in with him in July 2014; they declined.  (See id. at 162:25-164:2; 8/23/17 Trial Tr. 58:1-19).  On July 8, 2014, Rizk called the police and filed a report in an effort to regain custody.  (See 8/23/17 Trial Tr. 58:20-61:7, 130:3-10; see also Def. Ex. 109).  The police informed him that the issue was a civil matter, and their policy was to not get involved absent a court order or concern that children were in imminent danger.  (See 8/23/17 Trial Tr. 61:16-62:3, 134:3-12, 137:25-138:5).  Rizk wrote a letter to the District Attorney of Dauphin County before making "a big scene" at the DA's Office.  (See id. at 62:4-11, 63:5-6).  He retained a custody attorney after unsuccessfully seeking emergency relief pro se.  (See id. at 62:15-63:21, 90:8-9).  Rizk never regained physical custody of his daughters, nor did he become their court-appointed legal guardian after Lori's death.  (See id. at 73:5-76:19, 80:11-14).

On October 6, 2014, Rizk opened two joint checking accounts with the assistance of a banker at Wells Fargo Bank in Middletown.  (See 8/22/17 Trial Tr. 76:11-78:23, 82:14-19, 86:2-4).  Each account listed one of his daughters as the primary owner and Rizk as the secondary owner.  (See id. at 78:24-79:22, 81:3-14, 82:10-13, 83:2-6; see also Gov't Exs. 15, 16).  Although Rizk identified 27 Nissley Drive in Middletown as his home address, he listed a post office box in nearby Highspire, Pennsylvania, as the mailing address for both accounts.  (See 8/22/17 Trial Tr. 79:25-80:25).  Kyra and Serena were not present when Rizk opened the Wells Fargo accounts, and they would not discover that their father had done so for more than a year.  (See id. at 82:14-17, 83:15-25, 148:1-8, 164:3-6, 172:5-7).

### B.      Rizk Applies for Social Security Benefits

Shortly after opening the Wells Fargo accounts—and unbeknownst to his daughters—Rizk applied to receive benefits from two programs administered by the Social Security Administration ("SSA"): the children survivor benefit and the child-in-care program.  (See id. at 33:9-13, 164:7-11).  The survivor benefit gives a portion a deceased parent's Social Security contributions to their minor children.  (See Doc. 106, 8/21/17 Trial Tr. 107:16-108:4).  The SSA will pay 75% of the full benefit amount until the children reach 18 or graduate from high school, whichever comes later.  (See id. at 107:19-108:4, 114:20-115:1).  The children do not receive benefits directly; the money either remains with the SSA or it can be paid out to a representative payee, who typically is the surviving parent.  (See id. at 108:5-14; 8/22/17 Trial Tr. 30:18-22).  Regardless of the relationship between the representative payee and the beneficiary, they must physically reside together for the representative to receive the child's benefits.  (See 8/21/17 Trial Tr. 108:14-109:5).

Representative payees may save and invest their charge's survivor benefits instead of spending the money.  (See id. at 115:2-5).  If they choose to spend it, they must use the funds to address the child's needs, like buying clothing or a computer for school, or paying for medical care and household expenses.  (See id. at 109:6-18; see also id. at 130:2-11).  Whether they spend or save, the representative must account for the money they received on a yearly basis by submitting a form to the SSA.  (See id. at 115:5-9, 116:2-117:1; see also id. at 129:17-130:1; 8/22/17 Trial Tr. 50:7-51:6).  Once the child turns 18, the representative payee essentially becomes a

placeholder trustee; the SSA will instruct the representative to return all unspent funds to the agency for disbursement to the beneficiary or to make alternative arrangements—subject to SSA approval—to hand over the money directly.  (See 8/21/17 Trial Tr. 115:10-23, 117:1-118:25).  According to SSA Operations Manager Helen Hailemicael, the representative may establish a bank account in their own name or that of the child to receive direct deposits from the SSA, but under no circumstances are they permitted to invest funds in foreign trusts or bank accounts or to keep the money indefinitely without notifying the agency.  (See id. at 109:19-110:17, 119:1-5, 129:4-16).[2]

The child-in-care program pays benefits to the surviving parent of a child under the age of 16.  (See id. at 111:4-19, 112:3-19).  To be eligible for the program in 2017, the year Rizk was tried, a recipient's annual gross income could not exceed $16,920.  (See id. at 112:20-113:24).  The recipient also had to be married to the decedent; if they were divorced, the surviving parent would only be eligible for the program if they had been married for at least 10 years.  (See id. at 112:6-11).  As with

---

[2] We found no categorical rule against investing benefits in foreign trusts in our review of the Social Security Act and attendant regulations.  Federal law designates U.S. Savings Bonds as "preferred investments," along with "deposits in an interest or dividend paying account in a bank, trust company, credit union, or savings and loan association which is insured under either Federal or State law." See 20 C.F.R. § 404.2045 (2024); see also Soc. Sec'y Admin., Publ'n No. 05-10076, A Guide for Representative Payees, at 3-4 (2022) ("You should use the money in the beneficiary's best interests.  Then, if there's money left over, you must save it, preferably in U.S. Savings Bonds or an interest-paying bank account, insured under either federal or state law."), available at https://www.ssa.gov/pubs/EN-05-10076.pdf.  For purposes of the pending motion only, we presume foreign investments are permissible with prior agency approval.

the survivor benefit, the surviving parent must reside in the same household as the child to receive payments under the child-in-care program. (See id. at 111:20-22, 112:14-15; 113:25-114:15; 8/22/17 Trial Tr. 41:7-19, 44:8-22). Indeed, as Hailemicael stressed, living with the child beneficiary is a strict prerequisite to applying for either program. (See 8/21/17 Trial Tr. 114:10-11 ("We will not even take an application if they're not physically living with you.")). Unlike the survivor benefit, however, the surviving parent may spend child-in-care funds freely. (See id. at 111:23-112:2, 135:9-136:13).

Rizk called the SSA's Harrisburg field office and arranged an appointment to discuss applying to become his daughters' representative payee and obtaining benefits for their care. (See 8/23/17 Trial Tr. 46:6-20). On October 8, 2014, he met with Stanislav Yann, an SSA claims specialist, who read the pertinent application forms to Rizk and asked him questions to determine his eligibility. (See 8/22/17 Trial Tr. 22:1-6, 34:24-25, 30:21-40:23). Yann's "mentor" also was present to ensure that Yann, who was relatively new to the office, conducted the meeting appropriately and entered the information accurately.[3] (See id. at 11:9-14:7, 26:11-15, 27:9-14, 57:20-58:5). Yann filled out the forms on his computer; although Rizk

---

[3] Rizk has never identified Yann's mentor by name at any stage of these proceedings. Hailemicael mentored Yann initially, but Yann had a new mentor by the time he met Rizk. (See 8/22/17 Trial Tr. 26:4-10). Kendra Washington was Hailemicael's immediate successor in that capacity, but no witness identified her as the mentor who attended the meeting, she was not called to testify at trial or at the evidentiary hearing, and Yann used male pronouns when referring his mentor on cross-examination. (See id. at 14:8-12, 26:8, 57:14-16 ("My mentor, when he sat with me he thought that I did a fine job of summarizing the reporting responsibilities.")).

could not see Yann's screen in real time, Yann gave him a copy of the completed applications to review before submitting them.  (See id. at 43:21-44:7, 45:2-46:25, 49:10-14, 53:15-54:11; 8/23/17 Trial Tr. 48:3-9; see also Gov't Exs. 1-4).  Yann explicitly asked Rizk if his children were living with him—because "that's the question that everything hinges on"—and Rizk swore under penalty of perjury that they were.  (See 8/22/17 Trial Tr. 47:16-48:23, 51:7-52:21, 56:16-23; see also id. at 17:13-25, 39:10-20, 41:7-42:5, 47:1-3).  Yann also explained Rizk's duty to report to the SSA if the children's living situation changed and gave him literature outlining his responsibilities as representative payee.  (See id. at 42:6-43:20, 49:15-50:6, 52:22-53:10, 54:12-56:16, 61:6-7; see also Gov't Ex. 14).

Less than a week after completing the application, Rizk received three letters from the SSA.  (See 8/21/17 Trial Tr. 120:23-121:10, 124:9-15, 128:3-9).  The first letter stated that he was eligible for the child-in-care benefit based on the information he provided; he would receive a lump-sum back-payment of $6,300 retroactive to May 2014, as well as future monthly installments of $1,260 until his youngest daughter, Serena, turned 16.  (See id. at 121:11-122:13, 123:19-21; see also Gov't Ex. 5).  The second letter, which concerned Kyra's survivor benefits, said that she was similarly entitled to $6,300 in retroactive pay and $1,260 monthly payments, along with a one-time death-benefit payment of $127.50.  (See 8/21/17 Trial Tr. 124:8-126:4; see also Gov't Ex. 6).  The third letter discussed Serena's benefits but otherwise was identical to the second.  (See 8/21/17 Trial Tr. 128:2-22; see also Gov't Ex. 7).  Each letter instructed Rizk to notify the agency if he no longer had physical custody of his daughters, and they contained pamphlets explaining his obligation to report how he

spends the money and under what circumstances he must return funds to the agency.  (See 8/21/17 Trial Tr. 122:14-123:12, 126:5-127:24; 8/22/17 Trial Tr. 4:18-8:4; see also Gov't Ex. 14).

### C.    Prudential Life Insurance Policy

In addition to the SSA benefits, Kyra and Serena were entitled to the proceeds of a life insurance policy their mother had placed with Prudential Financial through UPS, her employer.  (See 8/22/17 Trial Tr. 108:8-109:15).  Lori designated her daughters as equal beneficiaries of the annuity, which had an approximate value of $115,800.  (See id. at 109:16-110:2).  Per Prudential's policies, minor children cannot access insurance proceeds until they turn 18 unless a court-appointed legal guardian applies for them.  (See id. at 110:3-17).  For security purposes, biological parents cannot act on behalf of their children's estate in these circumstances without a guardianship order.  (See id. at 110:18-111:24).

Two weeks after Lori's death, on May 28, 2014, Prudential sent two separate letters to 27 Nissley Drive addressed to the "parent or guardian" of Kyra and Serena.  (See id. at 112:16-113:2, 116:23-117:4; see also Gov't Exs. 28, 29).  The letters stated that the girls were entitled to a portion of the policy's proceeds, but they were not old enough to legally claim it on their own.  (See 8/22/17 Trial Tr. 113:3-14).  Prudential advised that it could disburse the funds to a court-appointed guardian before they turned 18.  (See id. at 113:23-114:8).  The letters supplied detailed answers to frequently asked questions and included return envelopes and forms directing Prudential to put the funds into interest-bearing accounts until a guardian

was appointed or the named beneficiaries reached the age of majority.  (See id. at

113:15-116:22).

Rizk wrote to Prudential a few weeks later, enclosing completed settlement

option forms instructing Prudential to keep the girls' money in escrow for the time

being.  (See id. at 117:8-118:25; 8/23/17 Trial Tr. 77:2-80:24; see also Gov't Exs. 30,

31).  In his response, Rizk acknowledged that he was not the children's court-

appointed guardian; he referred to himself as their "biological legal father."  (See

8/22/17 Trial Tr. 118:3-8, 119:1-8).  Prudential notified Rizk that it had transferred

the funds to separate accounts in accordance with his wishes and reminded him

that a court order appointing him guardian would be necessary to access the

money.  (See id. at 119:19-120:24; see also Gov't Exs. 32, 33).  Rizk called Prudential

several times over the ensuing months to inquire about how much money was in

the accounts and to express his desire that the money be kept with the company.

(See 8/22/17 Trial Tr. 122:2-12, 135:23-137:1; see also Gov't Exs. 34, 35).  Prudential

representatives repeatedly told Rizk that they could not release information to him

without guardianship paperwork on file.  (See 8/22/17 Trial Tr. 121:17-23, 137:2-25).

On July 1, 2015, seven weeks before Kyra's 18th birthday, Prudential sent a

letter to 27 Nissley Drive addressed solely to her.  (See id. at 122:13-123:24; see also

Gov't Ex. 21).  Prudential wanted to inform Kyra that she would be able to decide

how to settle the proceeds of the policy once she turned 18.  (See 8/22/17 Trial Tr.

124:4-18).  The letter included an election form and a claim settlement certificate

that Kyra could sign and return to receive her proceeds.  (See id. at 124:19-25,

125:13-126:24).  To prevent fraud, Prudential explained that it requires all age-of-

majority withdrawal request forms to be accompanied by a "medallion signature guarantee," a feature akin to notarization.  (See id. at 125:1-12, 126:25-127:11; see also id. at 98:12-99:19).

Rizk called Prudential on July 9 to tell them that he and Kyra had completed the form and that they were going to "have her signature guaranteed by the bank and send it over to you."  (See Gov't Ex. 35; see also 8/23/17 Trial Tr. 110:16-24; 8/22/17 Trial Tr. 130:19-131:9).  That same day, Rizk travelled alone to Mid Penn Bank in Steelton, Pennsylvania.  (See 8/22/17 Trial Tr. 101:1-2, 102:23-25, 168:19-22).  Rizk filled out the form Prudential sent to Kyra—writing his own name as the policy owner in the space provided on the first page—and Mid Penn Bank branch manager Fred Landis guaranteed Rizk's signature on the last page.  (See id. at 99:20-102:12, 104:2-6; see also Gov't Ex. 23).  Landis testified that if the person signing the form had been different than the certificate owner named on the first page, or if that part of the form purposely had been left blank, he would not have guaranteed the signature.  (See 8/22/17 Trial Tr. 102:6-12, 103:19-104:6).  Mid Penn did not retain a copy of the form; according to Landis, the bank does not "keep copies of documents when we perform signature guarantees."  (See id. at 103:13-16, 104:19-25).

Rizk promptly returned a completed election form to Prudential, but not the one containing the signature Landis had guaranteed at Mid Penn Bank.  (See id. at 101:8-102:4, 102:6-12, 104:2-6, 167:9-168:22).  Instead, the version Prudential received listed Kyra as the policy owner on the first page.  (See id. at 127:12-128:5, see also Gov't Ex. 23).  Kyra later identified the handwriting and signature on the submitted

form as her father's.  (See 8/22/17 Trial Tr. 166:21-168:22).  Alas, Prudential had no reason to doubt the form's legitimacy given the signature guarantee on the last page.  (See id. at 129:9-130:18; see also id. at 127:6-11 ("[T]he stamp signifies that the person signing the form is the owner of the contract.")).

Rizk elected to have the insurance proceeds electronically transferred into the account he established in Kyra's name at Wells Fargo, but he encountered an issue with the transfer because the voided check he attached to the form contained his name and the Highspire P.O. Box number he used to set up the account instead of Kyra's full name and the Nissley Drive address Prudential had on file for her. (See id. at 128:6-129:8, 132:5-8; see also id. at 138:5-139:12).  Prudential notified Rizk of the discrepancy, and Rizk reached out to Wells Fargo, prompting store manager Mitzi Wingert to fax a letter to Prudential on July 14 confirming that Kyra had an account with the bank and requesting that Prudential transfer the insurance proceeds into it.  (See id. at 89:21-94:2, 132:1-12; see also Gov't Ex. 19).  The letter did not mention Rizk or disclose his joint right of access.  (See 8/22/17 Trial Tr. 94:3-6).  Prudential transferred $57,982 into Kyra's account on August 18, 2015—four days after her 18th birthday.  (See id. at 131:13-20, 132:17-133:4, 139:23-140:3).

### D.    Rizk Spends His Daughters' Benefits on Himself

Between the Social Security benefits and the Prudential policy, more than $100,000 was transferred into Kyra's and Serena's accounts by the end of December 2015.  (See 8/23/17 Trial Tr. 9:15-11:17, 13:6-14:19, 17:24-18:19, 23:5-9).  Rizk put nearly all of it toward personal expenses.  (See id. at 22:11-23:12).  On the same day Prudential transferred Kyra's money, Rizk moved $41,000 from her account into the

one he shared with Serena, signed a $16,390 check to a law firm for legal fees he incurred during his custody dispute, and made a $302 purchase at Nordstroms. (See id. at 11:21-12:9, 18:24-19:4, 22:4-7). He spent money from Kyra's account in a variety of places unrelated to her care, including at an Egyptian resort, a hookah lounge, a law firm, two car dealerships, various retail outlets, and even a plastic surgeon. (See id. at 12:10-13:2, 16:1-24, 17:4-18, 22:15-23:4).

From Serena's account, Rizk spent $4,200 at a car dealership and wrote checks for more than $6,600 in additional legal fees. (See id. at 19:5-20:13). He also made numerous cash and ATM withdrawals from both accounts, extracting over $16,000 from Kyra's and nearly $50,000 from Serena's—just over $5,500 of which was withdrawn while he was in Egypt in February and March 2015. (See id. at 14:25-16:24, 19:16-21, 20:14-21:25; see also id. at 124:4-22). Rizk drained the bulk of Serena's balance—approximately $38,000—that September. (See id. at 21:20-22:10). Kyra and Serena both testified that Rizk did not spend any money on them during the period he was receiving their benefits, though the record reflects that he paid for counseling services for the girls on at least one occasion. (See 8/22/17 Trial Tr. 148:9-18, 149:11-14, 154:13-23, 174:15-23; 8/23/17 Trial Tr. 24:14-16).

Rizk received a letter from the SSA in December 2014 notifying him that the agency had terminated his child-in-care benefits because his income had exceeded the yearly limit (a fact he failed to disclose); however, the agency reversed its termination decision a few weeks later after Rizk reported that he anticipated having no income in 2015. (See 8/21/17 Trial Tr. 130:21-134:1; see also Gov't Exs. 8, 9). Rizk's child-in-care payments were terminated for good in July 2015 after

Serena turned 16.  (See 8/21/17 Trial Tr. 134:2-24; see also Gov't Ex. 10).  That August, Rizk received notice that Kyra's survivor benefits would soon come to an end because she was about to become an adult and no longer was in high school.  (See 8/21/17 Trial Tr. 136:14-19).  The letter instructed Rizk to return any unspent funds to the SSA or seek agency approval of an alternative method for relinquishing Kyra's money and it laid out how he could appeal the decision.  (See id. at 137:21-140:25; see also Gov't Ex. 11).  Rizk did none of those things.  (See 8/21/17 Trial Tr. 138:10-15, 141:1-4).  On his yearly accounting form, Rizk declared under penalty of perjury that both his daughters lived with him from November 1, 2014, through October 31, 2015, and that he spent all but $1,809 of Serena's benefits on her needs over that period.  (See id. at 141:5-145:22; see also Gov't Ex. 12).

Notwithstanding the flurry of letters from the SSA, Prudential, and Wells Fargo concerning their pecuniary interests, Kyra and Serena did not learn about their eligibility for SSA benefits until the summer of 2015, and they remained unaware that Rizk had been receiving payments on their behalf until Kyra tried to apply for benefits herself on her 18th birthday.  (See 8/22/17 Trial Tr. 147:11-25, 148:23-150:17, 152:20-153:4, 164:12-165:13).  They learned about the bank accounts in December 2015 after Kyra called Prudential to ask about her mother's life insurance policy and was told the money already had been paid out.  (See id. at 151:12-152:15, 166:1-15, 172:5-173:2).  Kyra and her grandfather went to the Wells Fargo branch in Middletown December 21, 2015, and were told her account had a balance of $126.16.  (See id. at 173:3-175:6; 8/23/17 Trial Tr. 11:18-20, 14:20-24).  When Serena checked her account later that day, her balance was approximately

$1,600, though it had been as low as $87.41 before an early December deposit from the SSA. (See 8/22/17 Trial Tr. 153:5-14; 8/23/17 Trial Tr. 18:20-23).

Kyra testified that Rizk never conferred with her about withdrawing the proceeds from the Prudential life insurance policy. (See 8/22/17 Trial Tr. 166:9-15, 168:23-169:18). She and Serena confronted their faither about the missing money directly and through lawyers. (See id. at 170:24-171:10, 175:18-176:5). After initially denying that he received their benefits, Rizk told them he put the money in an Egyptian trust worth $11 million. (See id. at 150:18-151:5, 153:15-154:2, 171:11-14, 172:2-4, 176:6-9). The SSA terminated Rizk's designation as Serena's representative payee in March 2016 and directed him to return her money, which he never did. (See id. at 154:3-12; 8/21/17 Trial Tr. 146:2-147:21; see also Gov't Ex. 24).

### E.    Indictment, Trial, Sentencing, and Appeal

The SSA's Office of Inspector General began investigating Rizk's conduct. (See 8/23/17 Trial Tr. 7:5-15). Special Agent Kevin Crawford examined bank records from the joint accounts at Wells Fargo and interviewed Rizk at his rental property in Steelton in mid-March 2016. (See id. at 7:16-9:8, 23:16-24:1, 25:18-24, 27:18-19, 32:1-8; see also Gov't Ex. 17, 18). During the interview, Rizk said he thought he was permitted to use his daughters' money because he believed they lived with him; he insisted their permanent address was 27 Nissley Drive, even though they slept at their grandparents' home. (See 8/23/17 Trial Tr. 24:2-13, 25:25-27:7). Rizk produced a document written in Arabic that he claimed established a trust for his daughters in Egypt; according to Agent Crawford, the document included a signature date of March 1, 2016—three months after Kyra and Serena

14

learned about the missing money.  (See id. at 24:25-25:10, 27:11-29:15, 32:17-33:10;
see also Def. Exs. 3-5).  Asked how he got the money out of the country without wire
transfers or a paper trail, Rizk explained that he carried cash on his person in
amounts under the $10,000 disclosure limit when flying to Egypt, which would have
taken ten or more separate trips given the sum he claims he deposited into the
trust.  (See 8/23/17 Trial Tr. 29:16-30:6).

On August 3, 2016, a federal grand jury indicted Rizk on one count each of
theft of government property, converting Social Security funds, and making false
statements in an application for Social Security benefits.  (See Doc. 1).  A fourth
count, wire fraud, was added by superseding indictment on April 26, 2017.  (See
Doc. 35).  The court appointed Monica D. Cliatt, Esquire, of the Federal Public
Defender's Office to represent Rizk, (see Doc. 20), and he was tried by a jury from
August 21 through August 24, 2017.  The government's case-in-chief consisted of
testimony from nine witnesses, including employees of the SSA, Prudential, and
Mid Penn Bank, as well as Kyra and Serena.  The government presented the letters
Rizk exchanged with Prudential and played audio recordings of his conversations
with company representatives.  (See Gov't Exs. 21, 23, 28-35, 110).  Prosecutors also
introduced bank records from Wells Fargo and Mid Penn, and produced letters the
SSA sent to Rizk, along with copies of documents from Rizk's application for
benefits.  (See Gov't Exs. 1-12, 15, 19, 24).

The defense, for its part, advanced the theory that Rizk had a good-faith
belief that he was entitled to make financial decisions on his daughters' behalf as
their biological father and thus lacked the intent to defraud either the SSA or

Prudential.  (See 8/23/17 Trial Tr. 51:8-11, 62:23-63:2, 111:4-114:3, 115:18-116:12;
Doc. 109, 8/24/17 Trial Tr. 32:14-37:18; see also 6/2/23 Hr'g Tr. 33:7-23).  To that end,
Rizk maintained that 27 Nissley Drive was his daughters' permanent legal address
and that they were just "visiting" their grandparents.  (See 8/23/17 Trial Tr. 63:22-
64:22).  To contextualize the custody dispute, Rizk called Justin Dinger, a former
Lower Swatara Township police officer who responded to Rizk's 911 call in July
2014.  (See id. at 130:3-13).  Rizk also attempted to introduce a contested will he
attributed to Lori, which he claimed granted him guardianship of the girls after her
death.  (See id. at 43:18-45:22).  We denied his request because the will had not been
verified by the Orphans Court of Dauphin County or the county's Register of Wills
and a mini trial over its merits risked confusing the jury.  (See id. at 45:4-22).  We
also found the exhibit irrelevant to the central issue of Kyra and Serena's residency.
(See id.)

Rizk testified in his own defense.  He disputed his daughters' description of
his relationship with Lori and of his home activities before her death.  (See id. at
40:25-43:4).  He claimed that they were in the process of reconciling and that he
performed various tasks around the home such as occasional maintenance,
cleaning, cutting the grass, cooking meals, and helping to pay bills.  (See id.)  Rizk
said he allowed Kyra and Serena to stay with their grandparents temporarily after
Lori's death before demanding that they move back in with him shortly after the
funeral, but they refused because their grandparents had brainwashed them
against him.  (See id. at 52:7-15, 54:13-56:7).

Although Rizk acknowledged applying for Social Security benefits for his daughters, he denied that Yann had asked him where they lived.  (See id. at 46:6-48:15).  He claimed he told Kyra about the Prudential policy proceeds, the Wells Fargo bank accounts, and the Egyptian trust over dinner at a restaurant.  (See id. at 90:18-92:3).  With respect to the paperwork Rizk submitted to Prudential, he said he was unaware Kyra personally had to sign the form, as he thought he was authorized to do so on her behalf as her father.  (See id. at 67:9-12, 92:9-13, 101:9-103:18).  He also admitted he was "afraid somebody else was going to get the money" after Mark Stambaugh's attorney filed a claim for the insurance proceeds.  (See id. at 51:13-18, 76:8-13, 85:19-23).  Rizk testified that he put every penny he collected into a trust fund in Egypt.  (See id. at 114:24-115:13, 116:13-20).  Upon being confronted with proof that he spent some of his daughter's money on personal expenditures like vehicles and plastic surgery, Rizk swore he replaced any money he depleted from their accounts with funds he deposited into the Egyptian trust.  (See id. at 116:21-125:7).

The jury found Rizk guilty on all counts.  (See Doc. 80).  We granted Attorney Cliatt's motion to withdraw and appointed Craig E. Kauzlarich, Esquire, to represent Rizk at sentencing and on direct appeal.  (See Doc. 93).  At sentencing, we applied a two-level enhancement for obstruction of justice after determining that Rizk engaged in "clearly premeditated deceit" while testifying.  (See Doc. 140, 3/28/18 Sentencing Tr. 5:10-7:22).  We then sentenced him to concurrent terms of 27 months' imprisonment on each count and ordered him to pay $122,257 in restitution.  (See Doc. 132 at 3-8).  Rizk appealed, challenging the two-level

enhancement and the court's refusal to admit the contested will into evidence.  Our court of appeals affirmed.  See United States v. Rizk, 758 F. App'x 276, 278 (3d Cir. 2019) (nonprecedential).

**F.      Section 2255 Motion**

Rizk, acting *pro se*, timely filed the instant motion pursuant to 28 U.S.C. § 2255, raising two dozen claims of ineffective assistance of trial and appellate counsel.  He briefly consolidated his claims to ten after we appointed Enid W. Harris, Esquire, as post-conviction counsel, (see Doc. 171 at 1-3), but then he reasserted all 24 grounds once Attorney Harris was replaced by Sarah Hyser-Staub, Esquire, (see Doc. 249).  We held an evidentiary hearing at which Attorneys Cliatt and Kauzlarich testified.  (See Doc. 254, 6/2/23 Hr'g Tr.).  Relevant aspects of Attorney Cliatt's testimony are incorporated into our analysis of Rizk's arguments. See Part III, *infra*.

Much of the hearing focused on the purported trust.  (See 6/2/23 Hr'g Tr. 19:1-30:19, 37:25-39:18, 41:9-43:7, 44:24-46:10, 47:19-53:8).  Rizk presented copies of the alleged trust agreement in its original form and as translated by the defense and by the government.  (See Def. Exs. 3-6).  Fred Landis and Rachel Brown, Mid Penn's loss prevention specialist, submitted affidavits confirming the bank does not retain records related to signature guarantees beyond seven years, and thus could not produce the signature log memorializing Rizk's visit in July 2015.  (See Def. Exs. 1, 2).  Following the hearing, Rizk abandoned all but eight of his claims, conceding that the record did not support several of them, while others are not

cognizable in a Section 2255 motion.  (See Doc. 255 at 17 n.8).  The motion is fully briefed and ripe for disposition.

II.  **Legal Standards**

A.  **Section 2255**

Under 28 U.S.C. § 2255, a federal prisoner may move the sentencing court to vacate, set aside, or correct the prisoner's sentence.  28 U.S.C. § 2255.  Courts may afford relief under Section 2255 on several grounds, including, *inter alia*, "that the sentence was imposed in violation of the Constitution or the laws of the United States."  See 28 U.S.C. § 2255(a); see also 28 U.S.C. § 2255 Rule 1(a).  The statute provides that, as a remedy for an unlawfully imposed sentence, "the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate."  See 28 U.S.C. § 2255(b).  The court accepts the truth of the defendant's allegations when reviewing a Section 2255 motion unless those allegations are "clearly frivolous based on the existing record."  See United States v. Booth, 432 F.3d 542, 545 (3d Cir. 2005).  A court must hold an evidentiary hearing when the motion "allege[s] any facts warranting § 2255 relief that are not clearly resolved by the record."  See United States v. Tolliver, 800 F.3d 138, 141 (3d Cir. 2015) (quoting Booth, 432 F.3d at 546).

B.  **Ineffective Assistance of Counsel**

A collateral attack based on ineffective assistance of counsel is governed by the two-pronged test set forth in Strickland v. Washington, 466 U.S. 668 (1984).  To prevail on such a claim, a defendant must demonstrate (1) counsel's representation

fell below an objective level of reasonableness based on prevailing professional norms, and (2) the deficient representation was prejudicial.  See Strickland, 466 U.S. at 687-88.  The defendant bears the burden of proving both prongs.  See id. at 687.

To determine whether counsel has satisfied the objective standard of reasonableness under the first prong, courts must be "highly deferential" toward counsel's conduct.  See id. at 689.  There is a strong presumption that counsel's performance falls within the broad range of reasonable professional assistance.  See United States v. Gray, 878 F.2d 702, 710 (3d Cir. 1989).  Only a "rare claim" of ineffectiveness of counsel should succeed "under the properly deferential standard to be applied in scrutinizing counsel's performance."  Id. at 711 (citing Strickland, 466 U.S. at 689-90).  To satisfy the prejudice prong, the defendant must establish a reasonable probability that, but for counsel's errors, the outcome of the proceeding "would have been different."  Strickland, 466 U.S. at 694.  The district court need not conduct its analysis of the two prongs in a particular order or even address both prongs of the inquiry if the defendant makes an insufficient showing in one.  See id. at 697; United States v. Lilly, 536 F.3d 190, 196 (3d Cir. 2008).

### III.   **Discussion**[4]

Rizk's eight remaining grounds for relief pertain to Attorney Cliatt's trial strategy.  He alleges Attorney Cliatt failed to: (1) fully investigate the authenticity of

---

[4] Our recitation of facts from the evidentiary hearing in this matter reflects the court's credibility determinations.  We find Attorney Cliatt's testimony to be highly credible.

the alleged trust document; (2) retain an expert in Egyptian trust law; (3) present the alleged trust document at trial; (4) investigate and contact the mentor who was present at Rizk's meeting with the SSA; (5) investigate whether Landis was required to maintain a physical copy of the document he certified at Mid Penn Bank; (6) offer into evidence the letter Rizk wrote to the District Attorney, or call his custody attorney to substantiate his efforts to regain custody of his daughters; (7) raise the fact that a state court judge advised him to seek out SSA benefits; and (8) introduce certain text messages between him and his daughters. (See Doc. 255 at 18-21). We address each issue *seriatim*.

### A.   Grounds 1-3: Authenticating the Trust

Rizk asserts that Attorney Cliatt failed to sufficiently investigate and present his "most important defense"—the Egyptian trust. (See id. at 18-20 see also Doc. 151 at 13-15). In his view, counsel should have retained an expert in Egyptian trust law who could have explained the process of creating a trust in Egypt and helped to authenticate the trust agreement. (See id.) But for Attorney Cliatt's supposedly inadequate investigation, Rizk contends the trust's validity would have been established and the jury might have found that he did not intend to defraud the government "because he took significant steps to put the[] funds aside for his daughters." (See Doc. 255 at 19).

A few details about the trust agreement exhibits bear mention at the outset, starting with the date of execution. Recall Agent Crawford's testimony that when he interviewed Rizk in mid-March 2016, Rizk claimed he had opened the trust "a while ago" but then furnished an untranslated document with a signature date of

March 1 of that year.  (See 8/23/17 Trial Tr. 28:20-24).  That date is not apparent on the face of the Arabic copy of the document presented at the evidentiary hearing. (See Def. Ex. 3).  Nor does it appear on the translations prepared by the defense or by the government, only the latter of which includes the words "Reviewed – Approved (Official Signature) March 12, 2016" at the top of each page and one instance of "Match [*sic*] 12, 2015" next to a registration number on the last page. (See Def. Ex. 4 at 1-5).  Furthermore, both translations expressly provide that Kyra and Serena could not access the cash or properties comprising the trust corpus until "they reach the age of 21 years old according to the Egyptian law," (see Def. Ex. 4 at 1, Def. Ex. 5 at 1), even though federal law entitled them to their Social Security benefits the moment they turned 18, (see 8/23/17 Trial Tr. 39:9-18).  And neither Kyra nor Serena signed the agreement (Rizk did so for them), so if the March 2016 signature date is to be credited, the document was executed months after Kyra reached adulthood.  (See id. at 42:11-43:7).

Attorney Cliatt was pressed on these issues and more.  She testified that she contacted two men in Egypt with the assistance of a translator at Rizk's request and in his presence.  (See id. at 23:7-24:4).  Neither individual could corroborate that the trust even existed.  (See id.)  One of the men, whom Rizk presented as an Egyptian attorney and the trust agreement's principal draftsman, apparently characterized himself as a "scribe" who simply wrote down whatever Rizk told him to write.  (See id. at 23:12-23).  The other, whom Rizk proffered as the trustee, refused to cooperate upon learning the matter involved Rizk's prosecution.  (See id. at 24:1-16).  Attorney Cliatt professed her willingness to fly to Egypt if necessary to meet with and depose

these potential witnesses, but their lack of cooperation frustrated her investigative efforts.  (See id. at 36:6-9).  In addition to tracking down witnesses, Attorney Cliatt reviewed bank statements Rizk provided and was unable to find any proof that he deposited money into a trust.  (See id. at 27:1-3).  From her careful review of the evidence, Attorney Cliatt deduced that while Rizk may have set some money aside, he used just about "all of it" on personal expenses—at a hookah lounge, on his car, and for trips to an Egyptian resort.  (See id. at 27:13-17).  Even the bank name and account number identified in the alleged agreement turned out to be a dead end; counsel could not get in touch with the bank and Rizk failed to provide her more information to facilitate her investigation.  (See id. at 25:24-26:7, 29:9-23; Def. Exs. 3-5).[5]

The trial record further undermines the trust's validity.  Agent Crawford testified that he examined various bank statements and ATM receipts showing money being drawn directly from Rizk's shared accounts.  (See 8/23/17 Trial Tr. 15:14-23:12).  There was no evidence that any funds were moved into a trust via wire transfer, (see id.), nor has Rizk produced any such proof to date.  Agent Crawford was incredulous when Rizk tried to explain away the lack of a paper trail by saying

---

[5] With respect to the banking information mentioned in the agreement, we note that the translated documents do not state that the Social Security funds and insurance proceeds were deposited anywhere in particular.  The agreement specifically provides that Kyra and Serena each "will receive half of the liquid money which is deposited in El Ahly Egyptian Bank in account number 01201537893 . . . which belongs to the first party (donor)"—i.e., Rizk—"which he acquired by legal inheritance from his deceased father Mohamed Saad Rizk."  (See Def. Ex. 5 at 2, 3; see also Def. Ex. 4 at 2, 3).

he flew to Egypt with the cash in his pocket, but always below the $10,000 carry-on limit.  (See id. at 29:19-30:6).  It would have taken Rizk numerous trips to transfer all the cash he withdrew between December 2014 and February 2016, (see id. at 15:4-16:24, 20:14-22:10), yet his foreign ATM withdrawals (totaling $5,505.41) only place him in Egypt between February 4 and March 18, 2015, (see id.)  The record reflects that Rizk spent most of the money he siphoned from his daughters' accounts on myriad personal expenses.  (See 6/2/23 Hr'g Tr. 27:4-7).

We find that Attorney Cliatt's investigation into the trust and her decision not to present the unauthenticated document as evidence were objectively reasonable under the circumstances.  Contrary to Rizk's contentions, Attorney Cliatt did not refuse to follow up on information he supplied.  She tried in vain to trace the funds to the Egyptian bank he identified and to track down foreign witnesses who could substantiate his claims.  We do not fault Attorney Cliatt for declining to travel to Egypt to depose the scribe or trustee or for failing to secure their presence as witnesses at trial.  She had ample cause to discount their credibility and to doubt the trust's existence after speaking with them.  Indeed, she already "had reason to believe" that Rizk was relying on other false documents, namely a fraudulent will that had been produced in a previous state court proceeding, in which Lori purportedly "asked that custody be given to him."  (See id. at 36:10-13).  Considering the bait-and-switch Rizk pulled with the paperwork he sent to Prudential, counsel's suspicions about certain documents he produced were warranted.  As an officer of the court, Attorney Cliatt's duty of candor permitted her to "refuse to offer evidence . . . that [she] reasonably believe[d was] false."  See PA.

R. PROF'L CONDUCT 3.3(a)(3).  Her persistent inability to confirm the validity of the trust agreement despite her best efforts was enough to justify refusing to offer it into evidence if only to avoid perpetuating a fraud on the court.  (See 6/2/23 Hr'g Tr. at 38:17-23).

Counsel's failure to call an expert who could have spoken to the process of establishing a trust in Egypt was justified as well.  Private trust agreements like the one Rizk hoped to introduce typically are not publicly recorded documents, therefore he needed a witness with personal knowledge that the document "is what it is claimed to be" for authentication purposes.  See Fed. R. Evid. 901(b)(1).  A general expert on Egyptian trust law with no insight into the genesis of the agreement at issue would not have sufficed.  Rizk identified two people he claimed were involved with the trust's creation: the scribe and the reluctant trustee.  The latter would not vouch for the Egyptian trust's validity after learning it had something to do with Rizk's prosecution, and the former could not do so because he admitted he just wrote down whatever Rizk told him to and thus lacked sufficient personal knowledge.  (See 6/2/23 Hr'g Tr. 23:12-24:16, 38:5-16).  Moreover, Rizk cannot substantiate his assertions of prejudice by relying upon "mere speculation" about what these witnesses might have said if contacted or called to testify.  See Gray, 787 F.2d at 712.  Rizk has had years to secure affidavits from the men Attorney Cliatt contacted and to produce an expert report from someone versed in Egyptian trust law who also could authenticate the trust agreement.  Having failed to do either, he has not met his burden in connection with these post-conviction proceedings.  See Rolan v. Vaughn, 445 F.3d 671, 682 (3d Cir. 2006) (requiring

assessments of <u>Strickland</u> prejudice "to be based on the potential witness's testimony to the habeas court") (citing <u>Gray</u>, 878 F.2d at 712).

We also find no reasonable probability that the verdict "would have been different" were it not for Attorney Cliatt's cautious approach to the trust question. <u>Strickland</u>, 466 U.S. at 694.  Assuming *arguendo* the trust exists and the money Rizk surreptitiously purloined from his daughters' accounts currently is stashed away for them somewhere in Egypt, our confidence in the jury's guilty verdict remains unshaken.  As the government correctly points out, whether the trust exists has no bearing on the fact that Rizk lied to the SSA and submitted falsified documents to Prudential to access funds reserved for his daughters' benefit, which he then plainly converted to his own ends.  (<u>See</u> Doc. 260 at 3).  The jury heard and necessarily rejected his testimony that he accounted for the more than one hundred thousand dollars he withdrew or spent on himself in the United States by depositing an equal amount in Egypt—much of which he dubiously claimed he transported in cash, under the $10,000 carry-on limit, and without leaving a paper trail.  (<u>See</u> 8/23/17 Trial Tr. 29:16-30:6, 114:24-115:13, 116:21-125:7).  Given his bouts of unemployment in the years preceding Lori's death, and his representations to the SSA that he expected to have no income whatsoever in 2015, (<u>see</u> 8/21/17 Trial Tr. 133:5-9; 8/22/17 Trial Tr. 146:8-10, 160:18-23, 171:15-19; 8/23/17 Trial Tr. 35:18-36:6; <u>see also</u> Gov't Ex. 9), a reasonable juror naturally might wonder how he managed to cover all the legal bills, Egyptian resort fees, car payments, retail purchases, and plastic surgery costs he fronted with Kyra and Serena's money.

In any event, the prospects of a different trial outcome must be "substantial, not just conceivable."  See Harrington v. Richter, 562 U.S. 86, 112 (2011) (citing Strickland, 466 U.S. at 693).  Rizk's incredible defense that he earnestly believed he could draw down his daughters' benefits was heavily contradicted by the overwhelming weight of the evidence, including his own suspect behavior.  We expressed our skepticism at sentencing that a *bona fide* trust existed, (see 3/28/18 Sentencing Tr. 15:8-15), and Rizk has done nothing to disabuse us of that distrust in the interim.  He is due no relief on his first three claims.

**B.    Ground 4: Contacting Yann's Mentor**

Rizk also argues that Attorney Cliatt should have discovered the identity of Yann's mentor and called them as a witness to counter the SSA claims specialist's testimony that Rizk said the girls lived with him.  (See Doc. 255 at 20; see also Doc. 151 at 13).  Attorney Cliatt could not recall if she attempted to contact the mentor in preparation for trial.  (See 6/2/23 Hr'g Tr. 7:18-8:19).  Based on the circumstances, though, it is unlikely that this mentor would have contradicted Yann's recollection or that such a contradiction would have mattered.  Both testifying SSA witnesses and virtually all benefits-related literature and correspondence introduced at trial emphasized the importance of residency as a dispositive factor in establishing and maintaining eligibility for the survivor benefit and child-in-care program.  (See 8/21/17 Trial Tr. 114:10-11; 8/22/17 Trial Tr. 56:23; see also Gov't Exs. 5-7, 14).  And we know Yann gave Rizk a copy of the completed application—which specifically asked whether he had "physical custody" of his children—and asked him to confirm the accuracy of his responses; Rizk falsely

answered yes and then stood by that false response.  (See 8/22/17 Trial Tr. 17:18-20, 44:3-7; see also Gov. Ex. 1).  Rizk could have subpoenaed the SSA to disclose the identity of Yann's mentor and called that person to testify at the evidentiary hearing or secured an affidavit setting forth the mentor's version of events.  But he did not. Consequently, we have no basis upon which to discredit Yann's testimony or the documentary evidence.  (See Gov't Exs. 1-4).  Once again, Rizk's mere speculation about what this witness might have said falls well short of establishing prejudice. See Rolan, 445 F.3d at 682; Gray, 878 F.2d at 712.

### C.    Ground 5: Scrutinizing Landis' Recordkeeping

Next, Rizk contends that Attorney Cliatt should have cross-examined Mid Penn branch manager Fred Landis about his signature log and investigated whether he was required to maintain a copy of the document whose signature he guaranteed in July 2015.  (See Doc. 255 at 20; see also Doc. 151 at 14).  Counsel did not recall this particular aspect of the trial in great detail, but we certainly do.  (See 6/2/23 Hr'g Tr. 16:10-18:25, 32:12-33:6, 37:19-24, 44:3-10).  Landis acknowledged he did not retain a copy of the document Rizk presented to him; he kept a record of the transaction—including "who it was provided for, the type of document, and the identification provided," (see Def. Ex. 1 ¶ 6)—per Mid Penn's standard practices, (see 8/22/17 Trial Tr. 103:13-16, 104:19-25).  Unfortunately, Mid Penn no longer possessed that record at the time of the evidentiary hearing because the bank "does not maintain records related to Medallion Signature beyond 7 years."  (See Def. Ex. 2 ¶¶ 3, 4).

Even if Mid Penn policy required Landis to retain a copy of the Prudential document beyond seven years and he failed to do so, this fact would not undermine his testimony that the document Rizk provided to him was different than the one Rizk sent to Prudential. (See 8/22/17 Trial Tr. 102:6-8). Landis firmly stated that he would have refused to certify Rizk's signature on the latter form because the policy holder listed on the first page and the signatory on the last page were not one and the same. (See id. at 102:9-12). The signature log would not have affected this aspect of his testimony or its centrality to the jury's verdict. After all, Rizk admitted on cross-examination that he signed the document he sent to Prudential even though he was not the certificate owner. (See 8/23/17 Trial Tr. 78:17-20; see also 6/2/23 Hr'g Tr. 37:19-24). We will deny relief on this ground as well.

### D.   Ground 6: Presenting Evidence of Rizk's Attempts to Regain Custody

Rizk laments Attorney Cliatt's decision to withhold evidence of his repeated attempts to regain custody of Kyra and Serena. He asserts that counsel should have introduced a letter he sent to the District Attorney of Dauphin County and called his custody attorney to contextualize his "claim that the girls lived with him." (See Doc. 255 at 20-21; see also Doc. 151 at 13). At the evidentiary hearing, Attorney Cliatt testified that she did not believe Rizk's attempts to regain custody were relevant to the principal issues at trial. (See 6/2/23 Hr'g Tr. 13:25-15:16, 37:6-18; see also id. at 44:11-23). We agree. Whatever context Rizk believes such evidence could have provided, it undoubtedly would have highlighted to the jury that his children did not, in fact, live with him at the time he applied for benefits—and that he was

acutely aware of this reality.  Attorney Cliatt weighed the slight value of appealing

to the jurors' sympathies against the prejudicial effect of highlighting the girls'

actual (and preferred) living arrangements and reasonably chose not to present the

letter or to call Rizk's custody attorney.  We will not fault counsel for her sound trial

strategy in this regard.

     **E.**     **Ground 7: Introducing the Dauphin County Judge's Advice to Apply for SSA Benefits**

In his penultimate issue, Rizk critiques Attorney Cliatt's failure to introduce

the fact that a Dauphin County judge "advised" him to apply for SSA benefits,

which might have "negated the aura of 'premeditated deceit.'"  (<u>See</u> Doc. 255 at 21;

<u>see also</u> Doc. 151 at 13).  When asked why she decided not to introduce this

evidence, Attorney Cliatt said it was irrelevant "because [the judge] didn't tell him

to misrepresent where the children were residing."  (<u>See</u> 6/2/23 Hr'g Tr. 15:17-16:9).

We concur.  Any effort to spin Rizk's fraudulent misrepresentations to the SSA on

"advice" he received from a judicial officer would have strained credulity.  Even if

the jury knew that a judge had prompted Rizk to apply for benefits, that

circumstance would not explain why he falsely represented to the SSA that his

daughters lived with him after being informed his eligibility for both programs

turned upon that factor.  Attorney Cliatt's refusal to pursue this line of argument

was reasonable and caused Rizk no prejudice.  Counsel cannot be deemed

ineffective for failing to make a meritless argument.  <u>See</u> <u>United States v. Sanders</u>,

165 F.3d 248, 253 (3d Cir. 1999).

**F.     Ground 8: Introducing Rizk's Text Messages with Kyra and Serena**

Lastly, Rizk faults Attorney Cliatt for not introducing text messages between him and his daughters that he believes could have been used to undercut their testimony.  (See Doc. 255 at 21; see also Doc. 151 at 14-15).  Rizk asserts that he provided counsel with texts containing discussions of family matters after Lori's death as well as the purported trust.  (See Doc. 151 at 14-15).  These messages have never been introduced into evidence; however, Attorney Cliatt recalled reviewing them.  (See 6/2/23 Hr'g Tr. 12:21-13:10).  She declined to introduce the messages about family issues because she did not consider the exchanges relevant to the issue of the girls' residency, and she did not present texts concerning Rizk's representations about the trust because she was unable to verify its existence.  (See id. at 13:11-24).  These are sound and legitimate reasons upon which to decline to use the texts for purposes of cross-examination.  Moreover, absent additional details about the messages' content, this court is not in a position to assess the probable effect they might have had on the jury.  Echoing our now familiar refrain, we cannot presume prejudice based upon mere speculation about what might have been found in the text messages.  See Rolan, 445 F.3d at 682; Gray, 878 F.2d at 712.  Rizk has wholly failed to carry his evidentiary burden as to the potential impact these messages may have had on the outcome of the case.

**IV.** **Conclusion**

For these reasons, we will deny Rizk's motion.  We will also deny a certificate of appealability, as Rizk has not made the requisite "substantial showing of the denial of a constitutional right."  See 28 U.S.C. § 2253(c)(2).  An appropriate order will issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:    April 23, 2024